W. W. HOBART, Administrator of the Estate of Kenneth Ray McClure Hobart, Deceased; and H. L. Jones, Administrator of the Estate of Roy Lorenzo Jones, Deceased, Plaintiffs,

v.

SOHIO PETROLEUM COMPANY, Defendant and Third-Party Plaintiff,

v.

OIL TRANSPORT COMPANY, Incorporated, Third-Party Defendant, and

GREENVILLE TOWING COMPANY, Third-Party Defendant and Third-Party Plaintiff,

v.

H. H. HOBART, Tina Mae Hobart, Guy Jones and Bessie Worthy Jones, Third-Party Defendants.

No. GC 6337.

United States District Court
N. D. Mississippi,
Greenville Division.

June 29, 1966.

Philip Mansour, Greenville, Miss., for plaintiffs.

W. G. Beanland, Vicksburg, Miss., W. C. Keady, Greenville, Miss., Bracewell, Reynolds & Patterson, Houston, Tex., M. E. Ward, Vicksburg, Miss., Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

## MEMORANDUM OPINION

CLAYTON, Chief Judge.

This action was brought by the Mississippi administrators of the estates of two deceased minors, Kenneth Ray McClure Hobart and Roy Lorenzo Jones, to recover damages for their alleged wrongful deaths, pursuant to Mississippi Code Annotated 1942 (Recompiled) § 1453. The defendant, Sohio Petroleum Company, is an Ohio corporation with its principal place of business in Ohio. The matter in controversy exceeds the sum or value of $10,000 and jurisdiction thus rests on the diverse citizenship of the parties. 28 U.S.C. § 1332.

The plaintiffs alleged that their decedents were crewmembers on the M/V Walter Williamson and its tow, the barges GTC–3, –4, and –5, all of which were owned and operated by Greenville Towing Company, Inc., a Texas corporation. This flotilla had taken on a cargo of Wyoming Sour Crude Oil at a river terminal at Hartford, Illinois, for shipment to Sohio's terminal at Mayersville, Mississippi, and, on the night of 6–7 September, 1961, was engaged in discharging the cargo at Mayersville. The shipment was allegedly made on Sohio's order. It was also alleged that in the course of their duties the decedents had entered the holds of the barges from time to time when carrying other cargoes, and that they had no reason to believe that this cargo was any different. However, plaintiffs alleged, Wyoming Sour Crude Oil has an unusually high hydrogen sulfide content, higher than that of any other type of domestic crude oil, and hydrogen sulfide is an extremely toxic gas capable, in high concentration, of causing death as rapidly as does hydrogen cya-

nide. Sohio alleged knew or should have known of the inherently dangerous characteristics of Wyoming Sour Crude Oil but failed to give any warning thereof to the crew of the flotilla. The decedents entered the hold of one of the barges during the discharge of the cargo on 7 September, 1961, were overcome by hydrogen sulfide gas and died, allegedly as a proximate result of Sohio's breach of a duty to warn.

Sohio answered and filed a third party complaint against Oil Transport Company, a Louisiana corporation which operates a barge line, and Greenville Towing Company. Sohio alleged that in January 1961 it had entered into a contract with Oil Transport for the shipment of crude oil from Hartford, Illinois, to Mayersville, Mississippi. This contract provided that Oil Transport would load and discharge the cargo at its sole risk and expense, including the risk of injury to crewmembers and others as a result of any inherent vice in the cargo. Oil Transport, in turn, allegedly sub-contracted with Greenville Towing Company in August 1961 for one voyage of tow laden with Wyoming Sour Crude Oil, with a similar agreement by Greenville to assure all risk of injury. Sohio asserted that if it was liable to plaintiffs, such liability was solely caused by the fault of Greenville and Oil Transport and that they should bear such liability.

Greenville Towing Company answered the third party complaint, which answer included a "counterclaim and crossclaim" against the original plaintiffs. The answer in addition to denying that Greenville had been negligent, alleged that the same plaintiffs had earlier made claims directly against Greenville for the deaths here involved and that a settlement had been effected which included a complete release. The claim against the plaintiffs was based on an alleged indemnity agreement included in the release, whereby the administrators had agreed to hold Greenville harmless from any loss incurred upon its being impleaded by Sohio as a result of proceedings instituted by plaintiffs against Sohio, and to refrain from executing any judgment against Sohio to the extent that Sohio might have judgment over against Greenville. At the same time, Greenville filed a third party complaint against the next of kin of the decedents, who had been parties to the releases, on the same theory.

The plaintiffs and next of kin separately answered Greenville's "counterclaim-crossclaim" and third party complaint, asserting that the releases were limited to Jones Act claims and did not extend to wrongful death actions, such as this one, brought under state law.

Sohio moved for summary judgment on the plaintiffs' complaint and also for summary judgment on its third party complaint against the two carriers. Oil Transport moved, in advance of answer, for summary judgment on Sohio's third party complaint, and Greenville filed a similar motion. This court overruled Sohio's motion insofar as it was directed to the plaintiffs' complaint. Believing that resolution of the controversy between the plaintiffs and Sohio might be decisive as to all issues, the court severed all issues except those between the original parties and reserved disposition on them pending determination of that original controversy. All further proceedings not encompassed in the original controversy were stayed.

A trial to the court sitting without a jury was held on the issues made by the complaint of the administrators and Sohio's answer thereto. These parties were granted leave to supplement the trial record by deposing expert witnesses after trial and plaintiffs later filed such a deposition. Counsel submitted proposed findings of fact and conclusions of law and memorandum briefs, and, following receipt of these materials, the court heard oral argument. On this basis, this cause is now before the court for disposition on the merits.

The Mississippi decisions are not inconsistent with the principles applicable in practically all other jurisdictions which impose a duty on distributors, shippers and other suppliers of inherently dangerous substances of con-

veying to users and other persons who may foreseeably be exposed to the hazard a fair and adequate warning of the dangerous potentialities. See, e. g., Farmers Gin Co. v. Leach, 178 Miss. 784, 174 So. 566 (1937); 1 Shearman & Redfield Negligence (Rev.Ed.1941) § 26, p. 64; 65 C.J.S. Negligence § 100. An inherently dangerous substance is one burdened with a latent danger or dangers which derives from the very nature of the substance itself, and the duty arises only with respect to hidden or concealed dangers. Harrist v. Spencer-Harris Tool Co., 244 Miss. 84, 140 So.2d 558 (1962); Campo v. Scofield, 301 N.Y. 468, 95 N.E. 2d 802 (1950); 65 C.J.S. Negligence § 100b (2), p. 626. Even though the danger may be hidden, the duty encompasses only dangers which are unknown, Farmers Gin Co., Inc. v. Leach, supra, and there is no duty to warn when the user has actual knowledge of the danger. Morrocco v. Northwest Engineering Co., 310 F.2d 809 (6th Cir. 1962). Knowledge of the danger is equivalent to prior notice, District of Columbia v. Moulton, 182 U.S. 576, 21 S.Ct. 840, 45 L.Ed. 1237 (1901), and a failure to warn of a fact of which the user is already fully aware is not a breach of duty. Sawyer v. Pine Oil Sales Co., 155 F.2d 855 (5th Cir. 1946). Discharge of the duty to warn may involve a constructive element, by giving the warning to the superiors in employment of the person to whom the duty is owed. Similarly, knowledge of the hazard on the part of the superiors may be reasonably assumed to have been communicated to the employees. See 1 Shearman & Redfield Negligence § 26, p. 66.

█ Crude oil is, for more than one reason, an inherently dangerous substance. One latent danger is the fire hazard. But, as the evidence shows without contradiction, the fire hazard is universally appreciated throughout the petroleum barge line industry, from inexperienced deck hand on up to company president. The United States Coast Guard and the carriers themselves have promulgated numerous safety regulations warning of and protecting against this hazard. Consequently a shipper would not have a duty to warn of the fire hazard in a shipment of crude oil.

A second hazard concealed in all crude oils, sweet or sour, is one which, for simplicity, although perhaps inaccurately, will be identified here as the suffocation hazard. It is generally known and understood in the industry that all crude oils evolve hydrocarbon gases at atmospheric pressure and ambient temperature. The rate and amount of discharge of the gases varies under different conditions, including amount of agitation, temperature variations and other factors. When the oil is confined, as in a storage tank or barge compartment, the gases to some extent will supplant the normal atmosphere in any free space inside the container. Because of their weight the heavier concentrations of hydrocarbon gases will be at the lower levels. To the extent that the hydrocarbon gases replace and drive out the oxygen in the normal atmosphere, the life sustaining capacity of the remaining atmosphere is reduced or eliminated, and an occupant of the compartment would suffer the effects of suffocation.

Whether or not any of the hydrocarbon gases are toxic, i. e., capable in sufficient concentration of producing, by chemical action, a deleterious organic effect on the human system, they create a serious hazard within such compartments. Thus there is a well known safety practice in the industry, supported by Coast Guard regulations, which forbids entry into a compartment which has contained crude oil unless it has since been "gas freed" by qualified persons and certified safe by a qualified chemist. In emergency situations, licensed tankermen may enter such compartments before they have been gas freed, but only if a fresh air mask and hose is utilized, a line is secured to the body and at least one strong person is standing by to assist at the first sign of difficulty.

█ The suffocation hazard and the corresponding safety rules are well known in the industry. There may be

instances where the rules have been violated without injury, but these instances may be ascribed to the varying amounts of gases evolved from different crude oils under particular conditions and the variations in each individual's demand for oxygen because of his physical characteristics and the level of exertion. Nevertheless, the evidence establishes that the rules are generally known in the industry and that the personnel of Greenville Towing Company had this understanding and followed this practice when dealing with crude oils.

The evidence also establishes by a substantial preponderance that, insofar as any latent hazards are concerned, the industry does not regard or treat sour crude oil any differently from sweet crude oil and that "sour crude oil," "Wyoming Sour Crude Oil," and related terms have no special significance in the industry in this sense.

The plaintiffs do not contend that Sohio had any duty to give warning of the inherent fire and suffocation hazards. Rather, their theory is that in addition to these inherent dangers sour crude oil, unlike sweet crude oil, contains and evolves hydrogen sulfide gas, which is toxic and, in sufficient concentrations, lethal. Wyoming Sour Crude Oil, they say, is the most dangerous since it contains and produces a greater amount of hydrogen sulfide than any other domestic sour crude oil. It is the plaintiffs' position that this additional latent danger was not known to the decedents or their employer; that Sohio provided no warning; and that as a proximate result of Sohio's failure to warn the decedents, they entered the hold of the barge and met their deaths from inspiring hydrogen sulfide gas.

In answer to interrogatories propounded by the plaintiffs, Sohio stated that it had given notice to Oil Transport of the dangers inherent in Wyoming Sour Crude Oil. However, Sohio's oil movement coordinator, by whom the warning was allegedly given, and the president of Oil Transport, the alleged recipient, both testified that no such warning was given or

received. The evidence is conclusive that no warning of any kind as to any inherent hazards peculiar to sour crude oils or Wyoming Sour Crude Oil was given by anyone to the decedents, to Greenville Towing Company or to Oil Transport. Since no warning was given, the remaining issues are whether an inherent danger of the character alleged actually existed in the particular cargo, unknown to the decedents or their employer, so as to require Sohio to give warning, and whether the failure to give warning was a proximate cause of the deaths.

In 1960 Sohio decided to purchase a quantity of sour crude oil from the Marathon Oil Company for the manufacturing of asphalt. The oil was produced in Wyoming by Marathon and transferred through a pipeline to Hartford, Illinois. Sohio determined that the best means of delivering the oil to its refinery in Kentucky was to barge it down the Mississippi River from Hartford to the Sohio terminal at Mayersville, Mississippi, at which point it would be introduced into a second pipeline connecting Mayersville and the Kentucky refinery. Oil Transport entered into a contract with Sohio to provide the river carriage during a nine month period in 1961. Scheduling demands and other factors occasionally made it necessary for Oil Transport to sub-contract portions of the carriage. One of the four sub-contractors was Greenville Towing Company which, through the medium of a barge transportation broker, undertook to make one voyage in September 1961. It was this voyage that culminated in the tragedy upon which this action is based.

A Greenville flotilla consisting of the M/V Walter Williamson and the barges GTC–3, –4, and –5, with plaintiffs' decedents as members of the crew, loaded approximately 44,000 barrels of cargo, identified in the sub-contract as "Wyoming Sour Crude Oil," at Hartford on 4 September, 1961. At 5:45, p. m., 6 September, the flotilla docked at Sohio's Mayersville terminal and began discharging the cargo.

The oil barges were 240 feet long with a beam of 50 feet and a depth of approximately 11 feet. The hold was divided into 10 cargo compartments which were 25 feet square and 10½ feet deep. Each compartment had an access hatch 18 to 24 inches in diameter, covered by a dome approximately three feet high, and under which stood a vertical metal ladder. Discharging was accomplished through a suction valve in each compartment to which a pump was connected. Some difficulty was experienced on this night with the valve in the number two starboard compartment of GTC–4 so that discharge was ended when approximately eighteen inches of oil remained in the bottom. The mate who decided to postpone investigation of the trouble until the morning apparently did not make this known to other members of the crew. Hobart came on watch at a later time, midnight, and observed that the number two starboard compartment was not unloading properly.

At approximately 12:30, a. m., on 7 June, the general manager of the company (who had temporarily assumed command) encountered Hobart at the number two starboard hatch. Hobart expressed his concern about the valve. The general manager looked into the compartment, told Hobart to not worry about it, and walked up to the number one hatch, fifty feet away. A few moments later the general manager returned to the number two hatch and found Hobart inside the compartment, near the top of the ladder, shining his flashlight around. The general manager told Hobart to come out and again walked away. He returned in two or three minutes to find Hobart half-way down the ladder. This time the general manager shouted, "I told you to come out of that tank and leave it alone." Hobart, conscious and comprehending, started up but then collapsed on the bottom near the base of the ladder, face down.

The general manager shouted for help and ran to the bow of the next barge, picked up a heavy line, and dragged it back to the hatch. He climbed down, trying to hold his breath, and attempted to attach the line to Hobart with one hand while hanging onto the ladder with the other. He began to feel dizzy and tried to climb out but he was unable to climb beyond the point where the hatchway dome rises above the deck. The company steward, who had heard the call for help, arrived in time to catch the general manager as he lost consciousness, but the steward was unable to lift him out. (The general manager was in his late forties and weighed over 210 pounds.) Other crewmen arrived some minutes later and pulled the general manager out. He had spent two or three minutes down in the compartment, in addition to the time which he was hanging onto the top of the ladder. The general manager was given mouth-to-mouth resuscitation for 12 to 15 minutes before he regained consciousness, feeling groggy and nauseated. Upon recovering he gave orders to operate the vents and turn on the blowers so as to put fresh air into the compartment.

Meanwhile, Jones and the off-watch crewmembers had arrived on the scene. While the others were preoccupied with the unconscious general manager, Jones went into the compartment in an attempt to rescue Hobart. After about five minutes Jones lost consciousness without having succeeded in his attempt at rescue. At this point the mate, a licensed tankerman, rigged an airline mask and went into the compartment but the airhose fouled and either made the mask ineffective or pulled it loose. Beginning to be affected by the fumes, he climbed out, leaving Jones and Hobart in the compartment.

After Jones had been in the compartment fifteen or twenty minutes, a pike pole was hooked through his belt and he was pulled out. Mouth-to-mouth resuscitation was administered for over forty-five minutes without success. Hobart's body was removed later with the aid of a looped line dropped over his foot.

Both the general manager and the mate had become nauseated and had vomited after their experiences in the hold,

and some of the other crewmembers were similarly affected. The steward who administered mouth-to-mouth resuscitation to the general manager became ill; another man who had similarly attempted to revive Jones was not affected. About an hour later a local physician arrived and pronounced Hobart and Jones dead. Some ten days later he certified the cause of death in each case as "suffocation due to crude petroleum gas." At the trial, however, he said "they died from poison, from inhaling the gas fumes down in this [hold] that they were in."

This witness said these gas fumes "smelled like hydrogen sulfide," and although he admitted that this was the first time he had ever smelled such an odor, he indicated that it was like that of rotten eggs. The doctor agreed that the gases in the hold would have removed the oxygen so that a person inside would suffocate, but he did not agree that this was the sole cause of these deaths. While his testimony is not clear on this point, it appears that the doctor was of the opinion that, in addition to the effects of suffocation, the causes of death included the action of a poisonous gas. This conclusion apparently was reached solely on the basis of the rotten egg odor, the circumstances described to him and the illness of some of the other men. No tests were conducted to determine the gas content of the compartment and no autopsies were performed.

Hydrogen sulfide is a colorless, inflammable gas having an offensive odor like that of rotten eggs. However, odor is not reliable as a warning of its presence in dangerous concentrations and the evidence directed toward the odors perceived at the death scene is equivocal and valueless in resolving the issues here. First, the expert testimony and documentary evidence demonstrated that this gas has a rapidly paralyzant effect on the olfactory nerve. So long as its odor can be detected, hydrogen sulfide is not present in sufficient concentration to cause any lasting ill effects; when the concentration increases to the dangerous levels the resulting paralysis of the olfactory nerve

precludes detection through the sense of smell. Second, all crude oils contain various aromatic constituents which produce strong odors, and while the expert testimony is conflicting on this point, it appears probable that some of the hydrocarbon gases have offensive odors. Accurate distinction of these odors from the odor of hydrogen sulfide would be difficult. Third, there is the obvious difficulty of learning from witnesses the exact nature of an odor, when each of them may perceive it with at least some slight difference and may resort to different and sometimes conflicting analogues in attempting to describe it.

In high concentration hydrogen sulfide has a systemic effect and in acute poisoning death is as rapid as in poisoning by cyanide. The increasing number of sour crude oil fields in the twenty years preceding World War II brought about a corresponding increase in the reports of injury and death in those fields as a result of hydrogen sulfide poisoning. Two of plaintiffs' exhibits, information circulars published in 1945 by the Bureau of Mines of the Department of the Interior, are examples of the governmental efforts to warn against the hazard. It is worthy of note that most of the casualties described in these documents seem to have occurred in the oil fields rather than at some remote location. The age of the documents, especially in connection with an industry which exerts so much effort in research and development, suggests that their conclusions should be scrutinized with care at this time.

The term "sour crude" is non-technical and its definition is largely relative. To some witnesses it meant an oil which would have a corrosive effect on barges and pipelines. To others it meant a crude oil having a higher than normal sulfur content. Plaintiffs contend that a sour crude oil necessarily contains hydrogen sulfide and that Wyoming Sour Crude Oil, by definition, is one which has an unusually high hydrogen sulfide content. No reconciliation of these definitions is necessary here, since, for present purposes, they are not in material conflict.

It is enough to find, as the court does, that sour crude oils have a higher than normal sulfur content and that most of these oils contain hydrogen sulfide.

"Wyoming Sour Crude Oil" is a name of convenience informally developed and then adopted as a trade label by the Marathon Oil Company. A number of other names such as "Ohio Special Asphalt Crude" and "Marathon Special Asphalt Crude" are equally applicable to the same product. Marathon produces crude oil from ten or more oil fields in Wyoming which contain thirty-one oil sands. Only three of these thirty-one sands show a gas analysis containing hydrogen sulfide; a trace in one, .15% in a second and approximately .18% in the third. The third sand containing oil with the heaviest concentration of hydrogen sulfide is one of four sands in the Elk Basin field.

The crude oil in the ground is under high pressure. When it reaches atmospheric pressure and ambient temperature at the well head, most of the gases present, including hydrogen sulfide, are spontaneously released. Through several processes carried out in the production field most of the remaining gases still entrained in the oil are removed for commercial purposes and as a safety measure. In the Elk Basin field, where the highest concentration of the gas is found, as much hydrogen sulfide as possible is removed for conversion into sulfur. Marathon then blends the crude oils from its ten or more fields into a special asphalt stream and pumps it through a pipeline from Western Wyoming to storage tanks at Hartford, Illinois. In 1961, as previously, sour crude oil from the Elk Basin field constituted only a small percentage of this blended stream.

As a result of the steps just described, the amount of hydrogen sulfide entrained in the blended crude oil which is capable of evolving at normal pressures and temperatures would necessarily be greatly reduced, if not eliminated, by the time the oil arrives at Hartford. Tests conducted by both Sohio and Marathon in late 1959 confirmed this fact. Crude oil is volatile and continues to give off hydrocarbon gases at ambient temperature and atmospheric pressure. Hydrogen sulfide, once exhausted, does not continue to evolve under such conditions. After this exhaustion occurs the gas can be separated only in the refining process by application of extreme heat, 650–750 degrees Fahrenheit. The laboratory analyses conducted by Sohio and Marathon in 1959 revealed no free or dissolved hydrogen sulfide in the crude blend at atmospheric pressure and ambient temperature. Further, Sohio analyzed each order of sour crude oil received at the Kentucky refinery to insure that the crude being received was the same as that purchased. Other more extensive tests were made from time to time and all of these tests consistently indicated the absence of any free or dissolved hydrogen sulfide at atmospheric pressures and ambient temperatures.

■ In the face of this evidence, which is substantially corroborated and not credibly contradicted, it must be found that the blended sour crude oil purchased by Sohio from Marathon and shipped via the Mississippi River from Hartford to Mayersville in 1961 did not contain a latent danger, as a result of the presence of hydrogen sulfide in the oil, which can be distinguished from and elevated above the latent danger identified here as the suffocation hazard or the latent danger caused by the presence of any other gases, toxic or non-toxic. No other, greater and special precautions would be required in the barge line industry to protect against injury from hydrogen sulfide gas, if any at all would be necessary, than would be required to protect against other known dangers. The carriers and their employees could not be reasonably expected to conduct themselves any differently in handling crude oils in absence of such a warning. Sohio therefore had no duty to warn plaintiffs' decedents in the circumstances established here.

■ Even if such a warning were required, plaintiffs have not carried their burden of proving that the failure to

warn was the proximate cause of the deaths. The evidence, rather than showing by a preponderance thereof that hydrogen sulfide poisoning was the efficient cause of the deaths, establishes to the satisfaction of the court that Hobart and Jones succumbed to a known danger, suffocation caused by the saturation of the atmosphere in the compartment with hydrocarbon gases which drove out the necessary supply of oxygen. The latter cause is certainly more probable and it is not inconsistent with the circumstances surrounding the tragedy, including the lengths of the periods of exposure of the four men who entered the compartment, the varying degrees to which they were affected, the exertion and emotional involvement (and possibly some element of panic) which increased each individual's demand for oxygen and thus aggravated the effect of the suffocating gases, and the illness experienced by the other crewmembers. (The last factor, as defendant's expert witnesses testified, can be accounted for without finding that they had inhaled a poisonous gas. Various physical and psychological stimuli, including the non-toxic hydrocarbon gases, the unpleasant odors, the sudden deaths of two shipmates, natural revulsion by those who gave mouth-to-mouth resuscitation coupled with the intake of gas-fouled air from the victim's lungs, and possibly the belief, whether rightly or wrongfuly held, that there was a toxic gas free in the area, might have contributed to the nausea experienced by these men.) In sum, the evidence is most persuasive that Hobart and Jones were suffocated by the non-toxic hydrocarbon gases which deprived them of oxygen.

At the same time, there is overwhelming evidence that no lethal concentrations of hydrogen sulfide were present in this barge compartment at this time. As described above, Sohio analyzed each shipment of oil as it reached the refinery in Kentucky. This cargo of crude oil was received at the refinery on 15 September, 1961, with nothing lost from the oil in vapors during its passage through the pipeline. The analysis of this particular shipment of crude oil, as in the other tests noted earlier, showed no hydrogen sulfide at temperatures ranging from 70 to 90 degrees Fahrenheit. The temperature of the oil in GTC–4 on the night of 6–7 September was in the mid-eighties, and under all of the circumstances then existing it is most improbable that any detectable, much less lethal, concentrations of the gas could have been found in the compartment in which the deaths occurred.

The defendant, Sohio Petroleum Company, is therefore entitled to judgment on the complaint of the plaintiffs. However, further proceedings in this court on the controversies which were heretofore severed and stayed, in advance of an appeal by the plaintiffs, might well prove to be valueless and unnecessarily wasteful in the event that the judgment for Sohio should be vacated or reversed by an appellate court. The special circumstances here amply justify resort to Rule 54(b), Federal Rules of Civil Procedure, and inasmuch as it appears to the satisfaction of the court that there is no just reason for delaying entry of final judgment as to the present controversy between the plaintiffs and Sohio Petroleum Company, the clerk will be directed to enter a final judgment as to that controversy. The severance and stay order as to the other claims will remain effective until further order of this court.

An order will be entered in accordance with the foregoing.