Mrs. Ruth HOSEY and Hope
Carol Hosey, etc.

v.

MOBIL OIL CORPORATION.

Civ. A. No. H74–82(R).

United States District Court,
S. D. Mississippi,
Hattiesburg Division.

April 6, 1981.

Leonard B. Melvin, Jr., Melvin & Melvin, Laurel, Miss., for plaintiffs.

George P. Hewes, III and Charles P. Adams, Jr., Brunini, Grantham, Grower & Hewes, W. Timothy Jones, Gordon Grantham, Jackson, Miss., for defendant.

## OPINION

DAN M. RUSSELL, Jr., Chief Judge.

This is a diversity action which was filed by the Plaintiffs, Ruth Hosey and Hope Carol Hosey, as the widow and minor child of James N. Hosey, deceased, both residents of Mississippi, against Mobil Oil Corporation, a foreign corporation, to recover damages for the wrongful death of James N. Hosey.

The case was tried before the Court without a jury, and based upon all the evidence of record, the pre-trial order, pleadings and proposed findings of fact and conclusions of law and memoranda of authority submitted by the parties, this Court makes the following findings of fact and reaches the following conclusions of law.

## FINDINGS OF FACT

In August of 1968, Mobil Oil Corporation (hereinafter Mobil) completed its Gatlin No. 1 Well, the discovery well in South Cypress Creek Field, Wayne County, Mississippi, and later drilled four additional wells on the Gatlin lease. Trans-State Oil Company, a division of Hess Oil and Chemical Corporation (hereinafter Hess) contracted to purchase all oil from this lease.

Under the contract Mobil was responsible for producing the oil and putting it in the storage tanks at the Gatlin tank battery (six 1,000 barrel storage tanks) in a merchantable form. Hess was responsible for determining the temperature, gravity and the basic sediment and water content of the oil and for loading the oil onto its trucks.

On October 7, 1968, R. G. Sparrow, in charge of the Houston Crude Oil Department of Mobil, who had negotiated the sale and purchase of the Gatlin lease oil with B. W. Andrus of Hess, received a report that a test of the Gatlin crude disclosed that it released hydrogen sulfide gas ($H_2S$) in excess of six percent and that Hess truck drivers were using a canister-type mask, which provided protection only up to two percent. Sparrow promptly notified Andrus by telephone of the dangerous concentration of hydrogen sulfide at the hatch on the top of the Gatlin tanks and advised that Mobil would provide self-contained air packs for the use and protection of Mobil and Hess employees.

On instructions from Sparrow, E. E. Campbell, production superintendent for Mobil with jurisdiction over Mississippi, by letter of October 11, 1968, to Rene Bourg, Hess general manager at its terminal in Heidelberg, Mississippi, gave further warning to Hess of the dangerous concentration of hydrogen sulfide emitted from the Gatlin crude.

On instructions of Campbell shortly thereafter, Hugh Hopper, Mobil's safety supervisor in the Shreveport area, purchased four self-contained air packs and several large reserve tanks for use in recharging the portable air packs and placed these at the Gatlin tank battery.

Hess engaged the Shilstone Testing Laboratory of New Orleans, Louisiana, an independent laboratory, to test the crude oil produced from the Gatlin lease. On October 29, 1968 Shilstone Lab sent their report to Hess. The purpose of the report to Hess was "to evaluate possible health hazards in relation to high concentrations of hydrogen sulfide and to consider safety practices for workers." (Def. Exh. # 8).

The tests conducted by Shilstone for Hess confirmed the extremely high concentration of hydrogen sulfide that had been previously reported by Mobil to Hess. Shilstone's tests were performed at tank hatches and various other spots around tank batteries.

Shilstone observed the handling and loading of Hess tank trucks and demonstrated safety practices in the use of self-contained air packs to Hess personnel.

In the report Shilstone informed Hess that human exposure to hydrogen sulfide in concentrations of 600 ppm and greater was fatal in 30 minutes, and that Hess personnel when they were near the top hatch covers may be exposed to such concentrations under Hess's then present method of operation.

On November 11, 1968, Shilstone Lab made another report to Hess. The purpose of this report was to evaluate possible toxic hazards to personnel relative to transporting sour crude. In this report, the hydrogen sulfide concentration at the Mobil-Gatlin tank battery was reported to be 9.7% by volume or 97,000 ppm. Concentrations of hydrogen sulfide were reported to Hess to be higher at the top of tanks especially during the opening of the tank hatches, and the top of tanks was considered dangerous to human life. Shilstone suggested 14 separate minimum safety practices for Hess to follow in handling crude at the various tank batteries Hess was purchasing crude from which contained hydrogen sulfide.

By letter dated January 13, 1969, Mobil acknowledged receipt of a copy of the Shilstone report to Hess and again gave Hess notice that Mobil had provided self-contained air packs at the Gatlin battery.

On the afternoon of March 15, 1971, Hosey and another Hess driver, Walter E. Cook, were assigned to haul crude to the pipeline terminal from the Gatlin tank battery. At approximately 9:00 p.m. that evening, upon arriving at the Gatlin tank battery, Cook found Hosey's truck parked in position for loading, but with the loading hose disconnected. Hosey was found lying unconscious at the top of the stairway leading to the catwalk connecting the tanks which was used by Hess drivers for measuring the oil by hand line dropped through the open hatch.

At the time Cook found Hosey, Hosey's hand light was on top of the tank, the tank hatch was open, and his gauge line was wrapped around his right arm and shoulder. Hosey was wearing a canister type mask provided by Hess in its trucks.

Efforts to revive Hosey were unsuccessful and he was pronounced dead upon arrival at Waynesboro Hospital. Autopsy determined that the cause of death was asphyxiation due to inhalation of hydrogen sulfide.

The decedent, James N. Hosey, was employed by Hess on February 20, 1971. Prior to that time he had been self-employed as a long haul truck driver and worked as a truck driver for Miller Transporters. Hosey had no experience in the hauling of crude oil. He had worked a total of 24 days for Hess before his death. On seven of those days, Hosey hauled crude oil from tank batteries where the concentrations of hydrogen sulfide exceeded two percent thus requiring the use of a self-contained air pack.

The uncontradicted evidence in this case reveals that Hosey had been specifically instructed on different occasions that when going on the tanks at the Mobil-Gatlin battery he was to use a self-contained air pack; that the hydrogen sulfide gas at the open hatch on the tanks at the Mobil-Gatlin battery was deadly; that the canister type masks supplied by Hess in its trucks were inadequate protection at the Gatlin battery and other batteries containing sour crude; and that if Hosey ever encountered a situation where the air supply was exhausted at any sour crude battery where self-contained air packs were required, he should either go elsewhere to obtain air, continue to another battery, or radio in to the dispatcher for further instructions, but in no event was he to go atop the tanks without a self-contained air pack.

Each time the hatch was opened atop the Mobil-Gatlin tanks, deadly concentrations of hydrogen sulfide vapor were released. This condition never varied. Hess had been made aware of this danger by Mobil and this information was confirmed by independent efforts to verify this condition as set forth in the Shilstone reports. There is no dispute that Hosey's employer, Hess, was

not fully aware of the dangerous condition to human life that existed at the Gatlin battery. Plaintiffs stipulate that Mobil notified Hess of the deadly concentrations of hydrogen sulfide gas around the tank hatches at the Mobil-Gatlin battery.

Hess had full control of and responsibility for the hiring, training and direction of its truckers. Hess drivers were solely responsible for sampling, gauging and removing the crude oil from the Gatlin battery. The testimony reveals that the methods of sampling, gauging and removing oil from the tanks required by Hess of its truck drivers were standard in the industry. Mobil, prior to Hosey's death, had offered to allow the use of side gauges, which were already installed on the tanks at the Mobil-Gatlin battery, to obviate the need for drivers to go atop the tanks. Hess declined this offer, taking the position that the side gauges were not sufficiently accurate.

Neither Mobil nor any other producer Hess was buying oil from participated in or had any active role in the training of Hess truck drivers. The evidence reveals that the practice in the industry was that the company that owned the trucks trained the truck drivers. The evidence further reveals that Hess did not look to Mobil and Mobil did not assume any responsibility for the training and supervision of Hess truck drivers.

Hess set the schedule of its drivers to load, measure and transport the crude. Hess dictated the operating procedures for its truck drivers. Hess hauled oil from various tank batteries on a 24 hour basis. A Mobil representative was not required to be present during the sampling, gauging and removing process. Hess never requested or looked for assistance from Mobil or its representatives in performing these functions. George Kemp, Hess truck dispatcher, testified that producers did not furnish field coverage for batteries hauled 24 hours a day.

Further evidence of Hess control over Hess truckers with regard to training, safety instruction and direction are found in the measures taken by Hess following Hosey's accident. After Hosey's death, Hess instituted a buddy system which required another Hess employee to accompany truckers whenever they were to go atop tanks known to contain lethal concentrations of hydrogen sulfide. Additionally, all canister type masks were removed from Hess trucks following Hosey's death and self-contained air packs were placed in all Hess trucks.

Hosey was trained on February 20, 21 and 22, 1971 by John Hinton, Hess driver trainer, and George Kemp, Hess truck dispatcher who had the final say in whether a driver applicant was qualified. Their testimony established that Hosey's training included the method of using and refilling the self-contained air packs. Hinton testified that he showed Hosey the three refill bottles located in the doghouse at the Mobil-Gatlin battery and also showed him how to refill the air pack cylinder. Both emphasized to Hosey the danger presented at hydrogen sulfide batteries and that Hosey was not to go on top of the tanks without a self-contained air pack.

On the night of March 15, 1971, M. G. Slaid, Hess coordinator, George Kemp and Wilson Waller, Hess truck driver, went out to the Mobil-Gatlin battery to recover Hosey's billfold which had been discovered missing after his death. All three agreed that the first thing they did on arrival was to try the self-contained air pack at the foot of the stairs leading up to the top of the tank battery. The cylinder on that unit was depleted. Slaid and Kemp went to the doghouse to obtain a source of air. Slaid testified that there was no air in two self-contained air packs he saw in the doghouse and no air in an extra cylinder found there. Slaid did not see any refill bottles. Waller took Slaid's car to the McIlwain battery, about one quarter mile away, and obtained a full cylinder. He then went atop the tanks and retrieved Hosey's billfold.

Defendant's motion for summary judgment in this case was denied by order of this Court dated March 14, 1977, because, inter alia, this Court felt that plaintiff's allegations concerning the lack of operative air packs and an accessible source of air to

refill the packs created a genuine issue of fact which could be resolved only by a trial on the merits.

After hearing both sides of the evidence this Court concludes that the preponderance of the evidence supports the fact that there was air available at the Mobil-Gatlin tank battery on the night of March 15, 1971. Slaid did not personally look at the gauges on any of the self-contained air packs he saw in the doghouse that night nor did he lift any of the packs out of their trunks, a necessary maneuver to ascertain the correct amount of air in the cylinder. Slaid also admitted that he had never been to the Mobil-Gatlin battery doghouse and that he was not familiar with self-contained air packs.

Additionally, Don Fulkerson, the independent contract pumper for Mobil, who was in charge of the Mobil-Gatlin battery, testified that there were four air packs at the Mobil-Gatlin site and three large refill bottles on the afternoon of March 15, 1971 before Hosey's death. While Fulkerson did not know how much air was in the packs or bottles he stated that there was "plenty to work with." Fulkerson also testified that on the morning of March 16, 1971, he examined the air equipment in the doghouse; that each of the three self-contained air packs contained a supply of air and that the refill bottles also contained air. A photograph of the interior of the doghouse (Exhibit D 5(g)) taken the morning after Hosey's death and Slaid's visit to the doghouse shows that there were three self-contained air packs and refill cylinders in the doghouse.

## CONCLUSIONS OF LAW

The plaintiffs decedent, James N. Hosey, was an employee of Hess, an independent contractor performing work and services upon premises owned by Mobil. Plaintiffs contend that Mobil was in complete charge of all operations at the Mobil-Gatlin battery, and that Mobil had the duty to promulgate safety regulations and precautions pertaining to the tank battery; that the place of work was extraordinarily dangerous to persons working in and about the tank battery; that Mobil had a duty to perform safety measures and to furnish employees for the purpose of directing and performing any and all safety measures; that Mobil had the duty to prescribe and furnish safety equipment for workmen in the area; and that Mobil was in exclusive control of the battery, its upkeep, maintenance and supervision.

It is undisputed that Hess and its employees were business invitees to the Mobil-Gatlin battery. Under the agreement between Hess and Mobil, Hess was purchasing all production from the battery and had a contractual right to send its employees onto the Mobil-Gatlin tank battery. The Mississippi Supreme Court in *Jackson Ready-Mix Concrete v. Sexton*, 235 So.2d 267 (Miss. 1970) discussed the duty of a property owner to business invitees:

> The duty toward an invitee does not extend to looking out for or preventing wrongful acts or disorderly conduct of the invitee, which may result in injury to him, or to prevent a careless person from injuring himself .... [Where the invitee knows of the danger or is chargeable with knowledge thereof, even a warning is not required, ... The basis of the inviter's liability for injuries sustained by the invitee on the premises rests on the owner's superior knowledge of the danger, and, as a general rule, he is not liable for an injury to an invitee resulting from a danger which was known to the invitee or which was obvious or should have been observed by the invitee in the exercise of reasonable care, or from a condition which was as well known or as obvious to the invitee as to the inviter, or from a danger which the invitee should reasonably have appreciated before exposing himself to it, ... It has been held that liability cannot be based on a condition of the premises which is incidental to the business being carried on there and to be expected by an invitee. [235 So.2d 269–270]

The Mississippi Supreme Court further defined the duty of a property owner to business invitees in *Mississippi Chemical*

*Corporation v. Rogers*, 368 So.2d 220 (Miss. 1979):

> The owner of a building owes a duty to an independent contractor and the latter's employees to furnish a reasonably safe place to work or give warning of danger . . .

> The duty to warn of any latent danger is fulfilled when the owner of premises warns an independent contractor of latent danger. *Mississippi Power & Light Co. v. Nail*, 211 So.2d 815 (Miss.1968).

> We also recognize the rule that knowledge of danger by an independent contractor relieves the owner from the duty of warning the independent contractor or his employees. In *Jackson Ready-Mix Concrete v. Sexton*, 235 So.2d 267, 271 (1970) we said:

>> Closely related to this exception is the rule that the owner is not liable for death or injury of an independent contractor or one of his employees resulting from dangers which the contractor, as an expert has known . . .

■ Thus under Mississippi law the duty of the owner of business premises to a business invitee is alternative:

(1) Either provide a reasonably safe place for work, or

(2) Warn the invitee or his employer or supervisors of the danger involved.

It is also undisputed that Mobil notified Hess of the lethal concentrations of hydrogen sulfide at the Mobil-Gatlin battery and that Hess truck drivers were using a canister type mask which did not provide adequate protection. Moreover, Hess, an expert in the field of purchasing and transporting crude oil, retained its own independent expert, the Shilstone Testing Laboratory, to verify this fact and to recommend safe operating procedures for Hess employees working around the Mobil-Gatlin battery as well as numerous other sour crude batteries from which Hess truck drivers routinely sampled, gauged, and loaded sour crude.

■ Plaintiff's decedent was chargeable with the knowledge given to his employer, Hess, by Mobil. As the Mississippi Supreme Court held in *Mississippi Chemical, supra,* the duty to warn of any danger is fulfilled when the owner warns an independent contractor of danger, and further, the knowledge of danger by an independent contractor relieves the owner from the duty of warning either the independent contractor or his employees. *Mississippi Chemical, supra* at 222.

In *Hobart v. Sohio Petroleum Company,* 255 F.Supp. 972 (N.D.Miss.1966) the District Court held:

> Discharge of the duty to warn may involve a constructive element, by giving the warning to the superiors in employment of the person to whom the duty is owed. Similarly, knowledge of the hazard on the part of the superiors may be reasonably assumed to have been communicated to the employees. 255 F.Supp. 972, 975.

■ Once Mobil adequately warned Hess of the presence of lethal concentrations of hydrogen sulfide gas at the Gatlin battery and the requirement for a self-contained air pack atop that battery it became Hess's responsibility to impart this vital knowledge to its employees and Mobil could reasonably assume that this had been done.

■ Hess alone was responsible for training the decedent to safely perform the ordinary duties of his job. Ultimate control of the decedent lay in the hands of Hess, his employer, i.e. the hiring, firing, training on job procedures, training in safety procedures, job assignments and working hours were all controlled by Hess.

Hess alone was responsible for passing on to their drivers notice of the deadly concentration of hydrogen sulfide at the Mobil-Gatlin battery and for training their drivers to operate safely under all conditions they would be likely to encounter at that battery and the numerous other sour crude batteries at which they would be expected to routinely work.

■ If Hosey were properly trained as to the dangers of the continuously deadly concentration of hydrogen sulfide atop the

Gatlin battery, the sole proximate cause of his death was his own negligence in violating the explicit instructions of his employer given to him during his training i.e. not to go on top of the tank without a self-contained air pack. Such training also included procedures to be followed in the event the air supply at a sour crude battery was exhausted. It is thus inescapable, that if Hosey had been properly trained his own negligence was solely responsible for his death, regardless of the presence or absence of air at the battery.

If Hosey were not adequately instructed in the need for the use of an air pack at the Mobil-Gatlin battery, the negligence of Hess by this failure is the sole intervening proximate cause of Hosey's death, not any alleged negligence on the part of Mobil. Indeed, if Hosey were not properly instructed as to the use of a self-contained air pack, the lack of air if any would not be a factor.

■ Mobil completely satisfied its duty to plaintiff's decedent in this case, by warning Hess, decedent's employer of the dangerous hydrogen sulfide concentration at Mobil-Gatlin battery. Mobil is therefore entitled to judgment on the complaint.

An Order in accordance with the foregoing Findings of Fact and Conclusions of Law shall be submitted within 10 days.