SMITH, Justice.
Mississippi Power & Light Company has appealed from, a judgment recovered against it in the Circuit Court of the Second Judicial District of Tallahatchie County in a wrongful death action brought by the surviving widow and child of John Nail, deceased.
Mississippi Power is a public utility engaged in generating and distributing electric energy and maintains a number of substations throughout its system, one of which is located near Webb, Mississippi.
At the time of his tragic death by electrocution at the Webb substation on March 11, 1966, Nail was twenty-eight years of age, married and had one son. The evidence shows that he was an affectionate husband and father and that he was a conscientious worker. He was a high school graduate, without special training in electricity, but knew “that it was dangerous — he was afraid of it.”
Nail’s death resulted while he was in the course of his employment by Redd Pest Control Company, Inc., a company engaged generally in the business of pest control. Redd’s management had solicited and obtained a contract with Mississippi Power to provide “bird management” at certain of its substations, including the Webb substation. The contract was in letter form, prepared by Redd on its stationery and addressed to Missisippi Power and was as follows:
June 16, 1965
Mississippi Power and Light Company P. O. Box 1640 Jackson, Mississippi
Attention: Mr. V. K. Smith
Gentlemen:
As requested, we hereby submit our proposal for bird management services at various locations in your system. These services will consist of application of whatever procedures are necessary to remove birds from the areas under control and prevent their recurrence. These procedures are designed to discourage birds from roosting and nesting in an area and are not intended to kill or physically harm them.
The areas under control will consist of the following sub-stations:
Delta Division Drew
Rosedale
Shelby
Webb
Northwestern Division South Greenville
Schlater
Indianola
Northern Division
Lula
Jonestown
Senatobia
The work to be performed by us under this contract will be done on the ground and in areas removed from your power lines and sub-station equipment and, recognizing the dangers of electrical equipment, we agree *817 absolutely to keep our employees and equipment away from your facilities. When any zvork needs to be done on bird nests located on or near your equipment, we will notify you and furnish the chemicals and instructions to you for application by your employees.. We agree to hold you harmless from any claims for injury or damage arising out of. our performance of this work. (Emphasis added.)
[End of first page]
The term of this agreement is one year and the price for these services will be $999.96, payable $83.33 per month beginning with the month in which satisfactory control of birds is attained and continuing a period of twelve (12) consecutive months. At the end of this 12-month period, this agreement, will continue on a month-to-month basis until cancelled in writing by either party.
It is agreed that other sub-stations operated by your company may be added to this agreement at any time by written notice from you for similar one year periods at a price of $8.33 per month each.
Servicing of these areas will be co-ordinated by our personnel with your managers in the areas involved so as to require a minimum of time from any of your personnel. We look forward to the opportunity of serving you.
Sincerely yours,
/s/ Fred Ray
Fred Ray President
FR/bb
ACCEPTED BY:
MISSISSIPPI POWER AND LIGHT COMPANY
BY:_/s/ F. S. Smith_
TITLE /s/ V.P._
DATE /s/ 6/17/65_
Upon the occasion in question, Nail, as Redd’s employee, obtained a key from the Mississippi Power employee in charge of the Webb substation in order to enter and carry out the contract work. The gate to the substation enclosure bore conspicuous warning signs “DANGER — HIGH VOLTAGE.” Nail unlocked this gate and entered the enclosure. Nothing more is known of his movements prior to his death. There was no eyewitness to the actual electrocution, but Nail’s body was seen as it fell from the “C” tower to the ground. At the moment that it was observed by the witness, Nail’s body was falling, and was in the air “a little higher than my head” from the ground.
Decedent apparently had climbed the “C” tower to remove a bird nest. By actual measurement, the energized lines and equipment supported by this tower were twenty-one feet five and one-half inches above the ground. The tower itself is a steel structure purposely designed and constructed without any steps, ladders or crossbars which might facilitate or invite climbing.
*818 The testimony of appellant's electrical engineering superintendent was that the 115,000 volts carried by the energized equipment at the top of the “C” tower was capable of arcing about 6 to 7 inches.” However, an electrician (whose experience had been limited to a system of 2300 volts), testified for appellees that he thought it possible that it would arc three feet. An electrical engineer testified for appellees that the dangerous elements at the substation were insulated by “setting them up higher than the normal elevation than a person would be. In this case, the high voltage parts were on the top of a steel structure, which composes the structure of the substation.” (These “elements” were twenty-one feet and five and one-half inches above the ground.) This portion of the substation is further described as follows:
The 115,000 volt line crosses over the “C” tower, and on that tower, is located an air-brake 115,000 volt switch. This switch is located on top of a stack of insulators approximately four and a half feet tall, and the top of the tower itself is approximately seventeen feet from the ground, which means that the 115,000 volt circuit across the top of that tower is approximately twenty-one and a half feet from the ground.
The bottoms of the stacks of insulators are seventeen feet above the ground and the energized lines and equipment are another four feet five and one-half inches higher, on top of the insulators.
The agreement between Redd and Mississippi Power itself reflects a complete recognition and appreciation of the situation by Redd, and full knowledge on its part of the manner in which the contract work could be done in complete safety and with no danger to its employees. This is acknowledged and emphasized by the cautionary words of the last paragraph on the first page of the contract. Redd’s president forwarded the contract to his manager with a memo attached in which he called attention to the importance of abiding by it:

Please note especially the last paragraph of the first page and comply with it at all times.

Please contact the Mississippi Power and Light Manager responsible for the operation of these substations in your area and make arrangements with him to get into the stations for the first treatment and future treatments, if necessary. (Emphasis added.)
Upon receipt of the contract and the attached memo, Redd’s manager, from whom Nail received his instructions, during the first week of December 1965, brought Nail in and went over both the contract and memo with Nail. He handed the contract, with memo attached, to Nail, who read them, taking “five or six minutes” to do so. The manager also “talked it over” with Nail and called his attention to the safety precautions to be observed and directed him to note the last paragraph of the contract referred to in the memo. Another employee of Redd’s, who had previously worked the Webb substation, was present at this discussion and he also instructed Nail as to how the substation was to be worked, the safety precautions to be observed, and he too invited Nail’s attention to the last paragraph on the first page of the contract. Nail responded that “he fully understood it.” He was asked if he needed any explanation and said that he did not. Nail was the third employee of Redd to service the Webb substation, and he himself did so on December 9, 1965, January 21, 1966, February 9, 1966, and March 8, 1966. He was killed on March 11, 1966. All of this is undisputed.
Aside from authorities holding that in the handling of electricity, power companies are charged with exercising the highest degree of care, appellees appear to rely most strongly upon White v. Mississippi Power & Light Company, 196 So.2d 343 (Miss.1967); Mississippi Power & Light Company v. Walters, 248 Miss. 206, 158 So.2d 2, 160 So.2d 908 (1963); and Henry v. Mississippi Power & Light Company, *819 166 Miss. 827, 146 So. 857 (1933). Each of these cases is distinguishable from the case at bar in controlling particulars. In Walters, the negligence consisted in maintaining power lines above known drilling activities being carried out by the use of booms, cranes and other devices obviously capable of reaching and coming into contact with the power lines. Similar considerations moved the court to hold that a jury question was presented by the evidence in White, where the power company knew of dragline operations being carried on beneath its lines and should have been aware and foreseen that the dragline boom might come in contact with them.
In Henry, where a thirteen-year-old boy was killed in a power company substation, the court meticulously limited its holding, saying that the evidence presented a jury question only as to whether the equipment in the substation constituted an attractive nuisance to a boy of that age. In Henry a thirteen-year-old boy had been admitted to the substation by his grandfather, the power company employee having it in “immediate charge,” every day for five consecutive days. He died by electrocution on the fifth day when he brought his head into contact with a high voltage wire by climbing upon a concrete block three feet high. The trial court directed a verdict for the power company. In reversing and remanding, this Court said that it was the duty of the company to exclude all persons from the substation enclosure, “except those who were entitled to enter therein” and to prevent the “admission therein of any except the company’s expert employees or those who had an actual and definite business with the company to accomplish which it was reasonably necessary to admit them * * *.” 166 Miss, at 836, 146 So. at 858.
The court held that the evidence presented a jury question because:
[A]lthough he told the child not to touch any of the machinery or appliances therein, this is not sufficient, if under proper instructions the jury should find that the said outfit comes within what is known as an attractive nuisance to a boy of the age of the decedent. These warnings or admonitions are not sufficient in respect to what are termed attractive and alluring nuisances as regards children of that age when the impulses of curiosity and adventure so strongly weigh in the control of their conduct. Id. at 836, 837, 146 So. at 858.
In concluding the court said:
The judgment is therefore reversed, with directions to retry the case along the lines set forth in the last paragraph of this opinion, under proper instructions to the jury. Id. at 837, 146 So. at 858.
It is to be noted that the court in Henry expressly recognized that persons having “an actual and definite business with the company” properly could be admitted to the substation. Here the evidence shows that necessary maintenance of the grounds within the substation, including such things as cutting the grass, is regularly and safely carried out.
Nail was neither an employee of Mississippi Power nor a member of the general public. He was an employee of Redd, an independent contractor, and was in the substation for the specific purpose of doing the contract work. He was perfectly safe so long as he remained upon the ground, and, in fact, was safe unless he should climb the tower and thus expose himself to the energized equipment twenty-one feet and five and one-half inches above the ground. Nail’s employer had been warned and fully appreciated the danger, and the warning had been passed on to Nail. This is not a case where the contract required Nail to perform inherently dangerous work or to bring himself in proximity to energized equipment.
The weight of authority supports the view that the contractor, in this case the power company, fulfills its duty by warning the independent contractor of any latent *820 danger. 57 C.J.S. Master and Servant § 606.
In Le Vonas v. Acme Paper Board Company, 184 Md. 16, 40 A.2d 43 (1944), the Court used this language:
In accordance with these basic principles, the law does not require that a person, who maintains even so deadly an instrumentality as a high voltage electric wire, shall anticipate at his peril every possible fortuitous circumstance under which some person might make a contact with the wire, resulting in injury or death. * * * Electricity is now used so universally in city and country, in home and in business, for illumination and motive power, and for communication and transportation, that it is a matter of common knowledge that any line carrying electric current is dangerous to a more or less degree. The fact that a wire is charged with electric current is notice of danger, and any person mindful of his safety should treat it with caution. Id. at 21, 40 A.2d at 45.
See also Schwarz v. General Electric Realty Corp., 163 Ohio St. 354, 126 N.E.2d 906 (1955); Grace v. Henry Disston & Sons, 369 Pa. 265, 85 A.2d 118 (1952); Hotel Operating Co. v. Saunders’ Adm’r, 283 Ky. 345, 141 S.W.2d 260 (1940). In Texas Electric Service Co. v. Holt, 249 S.W.2d 662 (Tex.Civ.App.1952), the court said:
It is undisputed that the deceased’s foreman was informed twice that the new wire which was strung would be energized in the area wherein the deceased was electrocuted and that said foreman knew at that time the wire was hot. It is noted that the deceased was not informed of the danger in time to protect himself from receiving his fatal injury.
‡ H* 5k * %
The facts in our case fail to show that any employee of appellant knew or had any reason to believe the deceased, or any other employee of the independent contractor, was undertaking to climb this pole where the wire was energized. Id. at 666, 667.
In Long v. Woollard, 249 Miss. 722, 163 So.2d 698 (1964), this Court said:
* * * It should be remembered that liability rests not upon the ground of danger, but upon the ground of negligence * * *. Id. at 739, 163 So.2d at 705.
It is undisputed that Redd, the independent contractor and Nail’s employer, was apprised of the danger and fully appreciated its nature and location and this is confirmed by the terms of the contract itself. Moreover, due warning was given Nail with respect thereto and he fully understood it.
All of the witnesses agree that it was perfectly safe for Nail to enter the substation and do the contract work so long as he abided by the contract and his instructions and that the only manner in which he could expose himself to any danger whatever was by climbing the tower, more than twenty-one feet high, so as to reach the energized equipment.
Appellees point out that Redd’s manager had remarked to Nail that sparrows were more “aggressive” during nesting season and told him to do a better job by watching where they “hit the ground” and by putting the medicated grain there. It is argued that this amounted to telling Nail'to climb the tower and to remove bird nests and constituted a breach of duty on the part of Mississippi Power. It is not suggested that Mississippi Power had any knowledge or means of knowledge of this conversation between Redd’s manager and Redd’s employee, Nail. Moreover, we do not think the conversation was capable of being so construed. If any thing, it again stressed putting the grain upon the ground. But even if Nail had been actually instructed by Redd to climb the tower to remove bird nests from energized equipment, Mississippi Power had no reasonable means of anticipating or foreseeing that Redd *821 would order its employee to act, or that he would act, in direct violation of the express conditions of the contract which specifically forbade both leaving the ground and the removal of bird nests. Although we are keenly mindful of the tragic aspects of the case as made by the evidence in the record, nevertheless, accepting as established all that the evidence proved or tended to prove, and all reasonable inferences to be drawn from it favorable to appellee, Mississippi Power was guilty of no negligence or breach of duty proximately causing or contributing to the death of Nail and there was no issue to fact with reference thereto for submission to a jury.
Appellant’s motion for a directed verdict should have been sustained.
Reversed and judgment here for appellant.
ETHRIDGE, C. J., and PATTERSON, INZER and ROBERTSON, JJ., concur.