# IN THE COURT OF APPEALS 4/22/97

# OF THE

# STATE OF MISSISSIPPI

## NO. 94-CA-00572 COA

TONYA EASTMAN CASKEY, INDIVIDUALLY AND AS GENERAL GUARDIAN OF THE ESTATES OF TABITHA DELVA JEAN EASTMAN AND CRYSTAL SHABON EASTMAN, MINORS;

 AND

 CIGNA INSURANCE COMPANY

APPELLANTS

 v.

 PRENTISS COUNTY ELECTRIC POWER ASSOCIATION

APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. ROBERT WALTER BAILEY

COURT FROM WHICH APPEALED: LAUDERDALE COUNTY CIRCUIT COURT

ATTORNEYS FOR APPELLANTS:

WILLIAM LISTON

LEE B. HAZLEWOOD

WILLIAM UTSEY

ATTORNEYS FOR APPELLEE:

DAVID L. SANDERS

JEFFERY J. TURNAGE

NATURE OF THE CASE: CIVIL -- WRONGFUL DEATH ACTION

TRIAL COURT DISPOSITION: SUMMARY JUDGMENT FOR THE DEFENDANT

MANDATE ISSUED: 10/30/97

BEFORE BRIDGES, C.J., COLEMAN, AND PAYNE, JJ.

COLEMAN, J., FOR THE COURT:

Tonya Eastman as guardian of the estates of her two minor daughters, Tabitha Delva Jean Eastman and Crystal Shabon Eastman, filed a complaint against the Prentiss County Electric Power Association (PCEPA) in the Circuit Court of Lauderdale County to recover damages for the wrongful death of Robert L. Eastman (Eastman), the father of Tabitha Delva Jean Eastman and Crystal Shabon Eastman (Beneficiaries). Eastman's two children based their claim for damages on PCEPA's negligence which they charged was the proximate cause of Eastman's death. Pursuant to lengthy discovery, PCEPA filed a motion for summary judgment, which the circuit judge granted. Tonya Eastman as guardian appeals from the circuit judge's grant of summary judgment in favor of PCEPA. We affirm the circuit court's grant of summary judgment for the reasons which we relate in this opinion.

## I. FACTS

An old one-hundred-thousand-gallon water tank, which the City of Booneville had erected and owned, stood in the northeast corner of the lot in which the Prentiss County Courthouse is located in Booneville, Mississippi. In late 1989 or early 1990, the City of Booneville and the Prentiss County Board of Supervisors (the Board) decided to remove the tank which stood near the courthouse because it had not been used to hold water for quite some time. The board of supervisors advertised in the January 4th and 11th, 1990, editions of *The Banner Independent*, Prentiss County and Booneville's local weekly newspaper, for bids from contractors to dismantle and remove the tank. In response to this advertisement, Hercules Tank & Iron Company, Inc., (Hercules) from Butler, Alabama, submitted the bid which the Prentiss County Board of Supervisors ultimately accepted on January 22, 1990. On January 30, 1990, the Prentiss County Board of Supervisors and Hercules entered into a written contract signed by J. P. Davis on behalf of the board, and Curtis Lolley, Hercules' sole owner, on behalf of Hercules.

On the cold, rainy and windy morning of February 9, 1990, a crew of three men from Hercules, J. J. Creighton, who was the foreman of the crew, Robert L. Eastman, and Kenny Driver, arrived at the job site to prepare for their disassembly and removal of the water tank. They first unloaded some of their equipment near the tank. At about 9:00 a.m. on that wintry and fateful morning, the foreman, Creighton, met with the board of supervisors to present them with a certificate of insurance from Hercules. Because Hercules would need a crane to lower the dismantled portions of the water tank, it had negotiated with B&B Concrete, Inc. (B&B), a business located in Tupelo, to furnish it a crane.

Later that morning, the Hercules crew met with John Sutter, a representative of B&B, to inspect the water tower to determine the size crane needed to accomplish the task of removing the parts of the water tower as the Hercules crewmen dismantled it.

Because the height of the tank determined the size of the crane appropriate for accomplishing the disassembly of the water tank, Sutter instructed Creighton to measure the height of the water tank. Although Creighton suggested to Sutter that "[t]hese old Rigby tanks, all of them are just about standard [height]," Sutter nonetheless insisted that Creighton and his crew measure the height of the water tank. When Creighton protested that his crew did not have a tape measure, Sutter went to his truck and returned with a one-hundred-foot steel tape. Creighton gave the tape to Eastman and Driver and told them to measure the tank from the top of the dome down to the ground. The two men climbed the ladder of the tank and proceeded to measure the inside of the dome.

Then Eastman remained on the catwalk of the tank holding the reel of the tape while Driver descended the ladder clutching the end of the tape to measure the distance to the ground. The ladder was located on the northernmost leg of the water tank. When Driver had descended to within ten or fifteen feet from the bottom of the ladder, the end of the steel tape slipped from his grasp and began to blow in the wind. Driver yelled out to Eastman, who still held the reel at the other end of the tape while he stood above on the catwalk, "Look out for the -- !," as the tape measure blew up into high voltage power lines which were located 13.3 feet from the northernmost point of the tank. When the steel tape contacted the high-voltage power lines, an electric current of 7200 volts ran along the steel tape into Eastman's body and electrocuted him. Creighton climbed the ladder of the water tank to get to Eastman, but he was too late. The shock from the 7200 volts of electricity killed Eastman instantly.

## II. LITIGATION

The two daughters and hence wrongful death beneficiaries of Robert Eastman, through their mother as their guardian, brought a wrongful death action against PCEPA. They claimed that PCEPA knew of the close proximity of the tank to the power lines, and charged that as a carrier of electricity, PCEPA owed a duty to Eastman to protect him from injury from those power lines. They concluded that PCEPA's negligence was the proximate cause of Eastman's death. PCEPA filed a third party complaint against Hercules for indemnification against the sums of money which the circuit court would order it to pay Eastman's beneficiaries, court costs, and its expenses incurred in defending Eastman's beneficiaries' claim against it. PCEPA rested its claim for indemnification from Hercules on Section 45-15-13 of the Mississippi Code.

The appellant, CIGNA Insurance Company, moved to intervene as the workers' compensation insurer for Hercules to protect its statutory right of reimbursement for the benefits it had paid Eastman's estate and two children, which motion to intervene the circuit court granted. Hercules filed an answer to PCEPA's third party complaint, and included in it a fourth-party complaint against B&B for indemnification of its obligation, if any, to PCEPA. Hercules also included in its complaint a counterclaim against PCEPA, the basis of which was the unconstitutionality of Section 45-15-13 of the Mississippi Code. Eastman's beneficiaries and PCEPA are the relevant parties to this Court's resolution of the issues in this case.

PCEPA filed a motion for summary judgment with the Lauderdale County Circuit Court. It alleged

the following reasons to support its motion:

1. PCEPA owed no duty, absent notice pursuant to section 45-15-9 of the Mississippi Code, to de-energize or insulate its lines which were well within the requirements of the National Electrical Safety Code; and

2. The decedent's employer was the sole proximate cause of the accident because it failed to notify PCEPA: (1) as it covenanted in its contract with the Prentiss County Board of Supervisors; (2) as it was required to do by the industry standards; and (3) as it was required to do by the Mississippi Code, that it was beginning work in high wind and rain, that it would use a metal tape measure, and that it would come within 10 feet of the high-voltage line; and

3. The accident complained of was not foreseeable as a matter of law; . . . .

To support its motion for summary judgment, PCEPA attached portions of the depositions of Ronny Roland, PCEPA's general manager, Travis W. Childers, the Prentiss County Chancery Clerk, John Sutter, J. J. Creighton, and Curtis Lolley. It further attached various documents from the Mississippi Public Service Commission which adopted the National Electrical Safety Code for "guiding principles" of utility work.

Eastman's beneficiaries filed their response to PCEPA's motion for summary judgment. In their response they set forth their argument to show that the evidence did create "genuine issues as to whether (1) PCEPA breached the duty it owed the decedent, (2) the plaintiffs sustained damages, and (3) causation between the breach and the death of the decedent. For their evidence, they too attached portions of the depositions of Ken Christian, J. J. Creighton, Ronny Roland, and an affidavit of Roy Martin, a licensed and practicing electrical engineer. They also outlined their argument that PCEPA had breached its duty to Eastman and that as the result of that breach of duty through its negligence, PCEPA was liable for Eastman's death.

The circuit judge found that there was no genuine issue of material fact and that PCEPA was entitled to a judgment as a matter of law. He accordingly granted PCEPA's motion for summary judgment by an Order Granting Summary Judgment Motion and Findings of Fact and Conclusions of Law. Among his findings of fact which this Court thinks are critical to its resolution of the issue in this case is the following:

22. At 9:00 a. m. February 9, 1990, Creighton did meet with the Board and presented his certificate of insurance.

23. After the 9:00 o'clock meeting, it is unclear from the deposition whether Creighton went to the PCEPA office, but assuming he did in fact visit PCEPA's office, Creighton admits that he did not tell PCEPA that Hercules was going to begin work on February 9, 1990.

24. On the morning of February 9, 1990, at approximately 9:00 a. m., Mr. J. P. Davis, President of The Prentiss County Board of Supervisors told Ronny Roland of PCEPA that

the work would not begin at the water tank until February 10, 1990 or February 12, 1990.

Among the circuit judge's conclusions of law were the following:

6. There is no evidence in this case to show, or even suggest, that the defendant, PCEPA owed any greater duty to Eastman than it did to the general public, since PCEPA did not have any notice, either constructive or otherwise, that Hercules was beginning work on February 9, 1990, and in fact was told that work would begin at a later date.

7. There is no evidence in this case to show, or even suggest, that the defendant, PCEPA, was guilty of any negligence proximately causing this accident.

Eastman's beneficiaries, by and through their guardian, have appealed from the circuit judge's grant of PCEPA's motion for summary judgment. CIGNA Insurance Company, the worker's compensation carrier for Hercules, has joined in their appeal.

### III. ISSUE AND THE LAW

In their statement of issues which Mississippi Rule of Appellate Procedure 28(a)(3) requires, the Eastman beneficiaries frame their one issue in the following language:

The sole issue presented on this appeal is whether the trial court erred in granting Prentiss County Electric Power Association's Motion for Summary Judgment. More specifically, the ruling of the trial court was based on a finding that Prentiss County Electric Power Association did not owe a legal duty to the Plaintiffs' decedent and that no genuine issues of material fact existed as to the issues of breach of a legal duty, if any, and the existence of causation between such breach and the death of the Plaintiff's decedent. The appellant respectfully submits that both of the findings upon which the lower court granted summary judgment were erroneous.

Therefore this Court's task is to determine whether the trial court erred in granting PCEPA's motion for summary judgment.

**A. Standard of Review for determining whether the trial court erred in granting or denying motions for summary judgment**

This Court employs a de novo standard of review when it evaluates issues arising from a trial court's grant of a motion for summary judgment. *Seymour v. Brunswick Corp.,* 655 So. 2d 892, 894 (Miss. 1995). The lower court may grant a motion for summary judgment "if the pleadings, depositions,

answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." M.R.C.P. 56(c). Eastman's beneficiaries correctly assert that for summary judgment purposes, "a fact issue is material if it tends to resolve any of the issues properly raised by the parties." *Grisham v. John Q. Long V F W. Post*, 519 So. 2d 413, 415 (Miss. 1988).

In *Brown v. Credit Center, Inc.*, 444 So. 2d 358, 362 (Miss. 1983), the Mississippi Supreme Court defined the trial judge's task when he or she considers a motion for summary judgment in the following language:

> [T]he court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried.

The previous quotation, which the Mississippi Supreme Court emphasized, is contained in the comment to Mississippi Rule of Civil Procedure 56. The supreme court further instructed the trial bench and bar:

> Federal cases suggest that the burden is on the moving party to establish that there is no genuine issue of fact, although this burden is one of persuasion, not of proof. When doubt exists whether there is a fact issue, the non-moving party gets its benefit. Indeed, the party against whom the summary judgment has been sought should be given the benefit of every reasonable doubt.

*Brown*, 444 So. 2d at 362.

To refine further the appropriate standard of review, the Eastmans offer the following quotation from *American Legion Ladnier Post 42 v. Ocean Springs*, 562 So. 2d 103, 106 (Miss. 1990):

> An issue of fact may be present where there is more than one reasonable interpretation that may be given undisputed testimony, where materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted evidentiary facts; . . . .

Eastman's beneficiaries conclude their exposition on the appropriate standard of review by correctly asserting that "[i]f any doubt exists as to whether there is indeed a fact issue, the trial judge should err on the side of denying the motion and permitting full trial on the merits," citing *Brown*, 444 So. 2d at 362.

PCEPA offers its own perspective on the standard of review of the trial judge's grant or denial of motions of summary judgment by asserting that "[t]he party moving for summary judgment has no duty to provide an evidentiary predicate negating the existence of a material fact respecting issues on which the nonmovant bears the burden of proof at trial," citing *Fruchter v. Lynch Oil Co.*, 522 So. 2d 195, 198 (Miss. 1988)). The issue in *Fruchter* was whether one defendant, Bud Keel, the operator of

a service station, was the agent and/or joint venturer of Lynch Oil Company. *Id.* at 197. The trial court sustained Lynch Oil Company's motion for summary judgment, and, on plaintiff Fruchter's appeal, the Mississippi Supreme Court affirmed the trial court's grant of Lynch Oil Company's motion for summary judgment. *Id.* at 201. The Mississippi Supreme Court allocated the burden of production and persuasion in motions for summary judgment to the party who carries the burden of proof on the issue which is the subject of the motion for summary judgment by writing: "The movant has the burden of production only where at trial the movant would have the burden of proof." *Id.*

PCEPA cites *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), to support its proposition that the movant for summary judgment who does not bear the burden of proof need only initially inform the trial court of the absence of evidence to support the non-movant's case. In *Celotex Corp. v. Catrett*, the United States Supreme Court explained: "[t]he burden on the moving party may be discharged by 'showing' -- that is, pointing out to the [trial] court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

This Court will attempt to merge all of the above facets of the standard of review for an appellate review of the circuit judge's grant of PCEPA's motion for summary judgment as we review, analyze, and resolve the issue of whether the circuit court erred when it granted the motion.

**B. PCEPA's duty to Eastman**

**1. Common law basis**

For the Eastman beneficiaries to recover on a negligence theory from PCEPA, they were "[r]equired to prove 1) that [PCEPA] owed a duty to [Eastman, their deceased father], 2) that [PCEPA] breached that duty, 3) that [they] incurred damages, and 4) that [PCEPA's] breach was the proximate cause of those damages." *Read v. Southern Pine Elec. Power Ass'n* , 515 So. 2d 916, 919 (Miss. 1987). "Whether a duty exists is a question of law." *Lyle v. Mladinich*, 584 So.2d 397, 399 (Miss. 1991). To be sure, the Mississippi Supreme Court has imposed an especially high standard of care on purveyors of electrical energy such as PCEPA. For example, in *Mississippi Power & Light Co. v. Shepard*, 285 So. 2d 725, 729 (Miss. 1973), the supreme court described an electric utility's duty as follows:

> The degree of diligence which a distributor of electricity must observe in the distribution of the dangerous agency of electricity is a very high degree of care. When human life is at stake due care under the prevailing circumstances requires that everything that gives reasonable promise of preserving life must be done regardless of difficulty or expense. Moreover, the degree of care increases as the danger increases.

As though to emphasize the height to which this degree of care ascends, in *Grice v. Central Electric Power Ass'n*, 230 Miss. 437, 455, 92 So. 2d 837, 841 (1957), the supreme court warned:

> [T]hose handling the dangerous agency of electricity should exercise the highest degree of care to keep their high voltage wires a sufficient distance from "men at work" that no contact therewith will probably be made in the usual course of events.

Notwithstanding the "very high degree of care" which the law imposes on a utility company in its transmission of electricity over its lines, "[a]n electric company is not an insurer and is not liable for injuries unless it is guilty of some wrongful act or omission." *Mississippi Power & Light Co. v. Shepard,* 285 So. 2d 725, 729 (Miss. 1973). "Foreseeability" is the key word which determines PCEPA's duty to Eastman. Eastman's beneficiaries cite *Mississippi Power & Light Co. v. Walters*, 248 Miss. 206, 158 So. 2d 2 (1963) to support their position that Eastman's death was foreseeable to PCEPA. In *Walters,* the Mississippi Supreme Court opined:

> The principal basis for determining liability of a power company for injuries resulting from contact between its wires and a crane or other movable machinery is the foreseeability of a situation arising which might lead to such injuries. If a reasonably prudent person in the position of the defendant should have anticipated danger to others from its installations, the defendant may be held liable.

*Walters*, 158 So. 2d at 16. They then cite *Mississippi Power & Light Co. v. Shepard*, 285 So. 2d 725, 732 (Miss. 1973) for the proposition that the concept of foreseeability does not require "that the particular injuries should be anticipated, but that some injury would reasonably be anticipated, and, if the negligence of the defendant was a continuing and contributing cause of the injury, the defendant is liable." The Eastman beneficiaries then conclude: "Application of well-established Mississippi law to the facts in this case mandate a conclusion that contact with PCEPA's power lines during work on the removal of the water tank was reasonably foreseeable and that, therefore, PCEPA was under a duty to actively take steps to guard against such contact."

It is foreseeable that PCEPA would foresee foreseeability differently. It argues, "PCEPA could not have foreseen that the work would begin on a windy and rainy day at least a full day prior to the day the work was scheduled to begin." It further argues that Eastman "was not a foreseeable plaintiff whom PCEPA owed any greater duty than it owed the general public." PCEPA then cites

*Mississippi Power & Light Co. v. Nail*, 211 So. 2d 815 (Miss. 1968) to support its position on this aspect of this issue. In *Nail*, a twenty-six-year-old employee of a pest control company was electrocuted when he climbed a steel tower within a substation to remove sparrows' nests on the tower. *Id.* at 816. His employer had instructed him not to climb the poles, but to watch the ground where the sparrows landed and to put the medicated grain there for the sparrows to eat. *Id.* at 820. The Mississippi Supreme Court reversed the trial court's judgment for the deceased employee's wrongful death beneficiaries against M. P. & L. and rendered judgment for the utility company. *Id.* at 815. In doing so the supreme court opined:

> Redd's manager had remarked to Nail that sparrows were more "aggressive" during nesting season and told him to do a better job by watching where they "hit the ground" and by putting the medicated grain there. It is argued that this amounted to telling Nail to climb the tower and to remove bird nests and constituted a breach of duty on the part of Mississippi Power. It is not suggested that Mississippi Power had any knowledge or means of knowledge of this conversation between Redd's manager and Redd's employee, Nail. Moreover, we do not think the conversation was capable of being so construed. If any thing, it again stressed putting the grain upon the ground. But even if Nail had been

actually instructed by Redd to Climb the tower to remove bird nests from energized equipment, Mississippi Power had no reasonable means of anticipating or foreseeing that Redd would order its employee to act, or that he would act, in direct violation of the express conditions of the contract which specifically forbade both leaving the ground and the removal of bird nests. Although we are keenly mindful of the tragic aspects of the case as made by the evidence in the record, nevertheless, accepting as established all that the evidence proved or tended to prove, and all reasonable inferences to be drawn from it favorable to appellee, Mississippi Power was guilty of no negligence or breach of duty proximately causing or contributing to the death of Nail and there was no issue to fact with reference thereto for submission to a jury.

*Id.* at 820-21.

In *Delta Electric Power Ass'n v. Burton*, 240 Miss. 209, 126 So. 2d 258, 261 (1961), the Mississippi Supreme Court opined:

> Of course, if lines safely constructed later become unsafe by reason of something done by another, the operator of the power lines cannot be held liable for injuries growing out of the unsafe condition unless they knew, or in the exercise of reasonable care should have known, of the unsafe condition.

From our review of the foregoing opinions rendered by the Mississippi Supreme Court, we agree with the Eastman's beneficiaries that Eastman's death by electrocution was foreseeable in terms of the activity associated with the dismantling of the water tank. In his deposition, J. J. Creighton, Hercules' foreman, testified, "I mean, when we're doing tanks, there's ropes hanging off that tank, and everything else that can blow into a power line. I mean, this ain't a tape measure. I've seen ropes blow into them [power lines], and I've seen other stuff get into them." While Creighton's testimony was in response to a question about whether Eastman appreciated the danger posed by the power lines along the side and beneath the water tank while he was working on dismantling the tank, it also establishes that "stuff," whether a rope or a steel tape, can blow into or otherwise become entangled in a power line during the dismantling of a water tank.

## 1. The circuit judge's findings of fact and conclusions of law

However, as we previously quoted from the circuit judge's conclusions of law, the circuit judge found that "[T]he defendant, PCEPA owed [no] greater duty to Eastman than it did to the general public, since PCEPA did not have any notice, either constructive or otherwise, that Hercules was beginning work on February 9, 1990, and in fact was told that work would begin at a later date." If this conclusion of law is sound, if it is supported by the findings of fact, three of which we also quoted, and if there is no issue of fact that PCEPA received no notice that Hercules was about to begin dismantling the water tank on Friday, February 9, then we must affirm his grant of summary

judgment to PCEPA. This Court must affirm because "[I]f lines [which are] safely constructed later become unsafe by reason of something done by another, the operator of the power lines cannot be held liable for injuries growing out of the unsafe condition unless they knew, or in the exercise of reasonable care should have known, of the unsafe condition." *See Delta Electric Power Ass'n*, 126 So. 2d at 261; *Nail*, 211 So. 2d at 820-21. Eastman's beneficiaries do not charge that PCEPA was negligent in the design, location, construction, or maintenance of the high-voltage power lines into which the steel tape blew. Instead, they rest PCEPA's negligence on its failure to take appropriate action to protect the members of Hercules' crew from injury after PCEPA knew that Hercules' crew had begun to disassemble the water tank.

### 2. Foreman Creighton's visit to PCEPA's office on Friday morning before Eastman was killed

The circuit judge found that while it was uncertain that Creighton had visited PCEPA's office, Creighton had admitted that he did not tell PCEPA that Hercules was going to begin work on February 9, 1990. He further found that J. P. Davis, president of the Prentiss County Board of Supervisors, told Ronny Roland, the general manager of PCEPA, that the work would not begin at the water tank until February 10, 1990 or February 12, 1990. As a court of appellate jurisdiction, we must defer to the circuit judge's findings of fact unless we can determine that he was manifestly wrong when he made those findings of fact. *See Wicks v. Mississippi Valley State Univ.*, 536 So. 2d 20, 24 (Miss. 1988) ("The holding by a trial judge as factfinder is entitled to the same deference as a jury verdict and will not be reversed upon appeal unless manifestly wrong.").

Creighton was the only person to testify about whether he went to PCEPA's office on Friday morning, February 9, 1990. We quote relevant portions of his testimony in the various segments of his deposition which either PCEPA attached to its motion for summary judgment or Eastman's beneficiaries attached to their Response to PCEPA's motion for summary judgment as exhibits.

Q. Before you started that day, had you had any contact with Prentiss County Electric Power Association?

A. I can't answer that. I can't remember.

Q. What I'm asking you is if you called them to talk to them or called them to tell them you were there or called them to tell them you were about to begin work, Prentiss County Electric Power Association?

A. I'm trying to remember. See, there was a power line underneath the tank that went to a gas pump, that I had to have -- the gas pump and all was removed. It belonged to the city or the county, one. And I'm trying to think who I talked to about moving that line. I had -- the line had to be moved.

Q. Well --

A. If I ain't mistaken, me and -- me and Eastman went over to the power company because the power line was hooked to the courthouse.

Q. Well, let's -- I just want us to keep separate between when you started the job after Mr. Eastman's death and the day of his death. When you arrived on the night of the 8th and you got over there on the 9th, and I'm asking on that day, the 9th, if you had any contact with Prentiss County Electric Power Association on the 9th of February or before the 9th of February?

A. That's what -- that's what I'm saying about the power line, because that -- that run the courthouse. The onliest (sic) way to get it moved was with the power company.

. . . .

Q. Mr. Creighton, tell me whether or not you went there [to the PCEPA office] the morning of this occurrence.

A. I'm going to say yeah.

Q. Are you sure?

A. Man, I'm not positive.

. . . .

Q. You're not positive that you went there this -- that morning?

A. I'm about 99 percent sure.

Q. Okay. Now, tell me who you talked to.

A. I done told you.

Q. White, female, black, white, age, appearance?

A. I talked to a lady. It was a white lady at the front desk.

Q. And what time?

A. I will say around 9:00 -- I don't know, 9:30. After I talked with Mr. Davis at the power --at the board meeting.

Q. Did you go straight from the board meeting?

A. No sir. I went to the tank over there and looked at the power line with Mr. Davis.

Q. And who was with you?

A. When?

Q. When you went to the power company at 9:30 and talked to the white lady?

A. Robbie -- Robbie Eastman.

Q. Okay. And what exactly did you say to the white lady?

A. Just asking. I needed to see someone about getting a power line moved from the courthouse out from underneath the tank.

Q. Okay. And what -- what happened next? What did she say?

A. Said somebody would come talk to me. But nobody ever showed up because he got killed before somebody come over there. After he got killed, then they started showing up.

Q. Any other contact with the power company?

A. Only the day after I come back after -- after he was buried, and we went back up there and taken the tank -- started working on the tank, and they come up there and put them reducers on the power line.

Q. Was anybody present when you talked to the white lady over at the power company other than Mr. Eastman and yourself?

A. No, sir, I can't think of nobody.

. . . .

Q. So you made no mention of the main line to the left in the picture?

A. No, sir.

. . . .

Q. Okay. Did you tell them you were going to begin work that day? I assume that you didn't since you said you weren't going to begin with it that day.

A. No. I just told them I needed to see someone about moving a power line because I can't -- you know, you can't start cutting on something if you got a line running through a tank. . . . .

. . . .

Q. Having said that, Mr. Creighton, why is it you made the decision not to say anything to the power company about helping you with the high voltage line on the side of the street by covering it up or insulating it in some way?

A. Because I wasn't going to be working near the power lines as far as a crane or any kind of equipment was going to -- towards the power line. Everything was going up the hill away from it. All the steel was going to be swung away from it.

We determine that at best Creighton's testimony established only that he went to PCEPA's office on the morning of Friday, February 9, 1990, to inquire about the removal of the power line which ran beneath the water tank to the courthouse. His testimony does not indicate that he told PCEPA's employee that his crew had begun or would begin to dismantle the water tank that morning. We quoted earlier from the opinion in *American Legion Ladnier Post 42 v. Ocean Springs*, in which the supreme court opined that an issue of fact may be present where materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted evidentiary facts. We recall that in *Mississippi Power & Light Co. v. Nail*, Nail's wrongful death beneficiaries argued that the manager's remark to Nail that sparrows were more "aggressive" during nesting season and told him to do a better job by watching where they "hit the ground" amounted to telling Nail to climb the tower and to remove the bird nests. The Mississippi Supreme Court opined that the conversation was incapable of being so construed. This Court concludes that Creighton's testimony that on the Friday morning before Eastman was killed he went to PCEPA's office, where he inquired of an employee about having a power line removed from beneath the water tank, does not constitute notice to PCEPA that work had already begun on dismantling the water tank.

### 3. Testimony of PCEPA's general manager that the president of the board of supervisors told him dismantling the water tank would begin the next day

Moreover, the circuit judge also found that at approximately 9:00 a. m. on the same morning, the president of the Prentiss County Board of Supervisors had told Ronny Roland, the general manager of PCEPA that dismantling the water tank would not begin until the next day, a Saturday, February 10, 1990, or Monday, February 12, 1990. In his deposition, Roland testified:

> [J. P. Davis, president of the Prentiss County Board of Supervisors] told me that they were going to start construction tomorrow. Now, this was the morning of the accident. And in my mind, as soon as I hung up, you know, after he told me that, I was thinking, "Well, tomorrow is Saturday. Did he mean Monday, or did he really mean tomorrow, Saturday," when they were going to start construction.

> And so it was going through my mind. And since I had had no contact from that company about their work plan or whatever -- which, you know, they should have presented to us before starting any dismantling -- that what would I do, you know, if nobody contacted me.

Eastman's beneficiaries offer no evidence to contradict or to impeach the foregoing testimony from Roland. Thus, as we are expected to do unless he is manifestly wrong, we again defer to the circuit judge's finding of fact that the president of the Prentiss County Board of Supervisors had told the general manager of PCEPA that dismantling the water tank would not begin until the next day, a Saturday, February 10, 1990, or Monday, February 12, 1990. We must then further conclude that

PCEPA had been notified that Hercules' dismantling of the water tank would begin no earlier than the next day, Saturday, February 10, 1990.

**4. Affidavit of Roy A. Martin, an electrical engineer and expert witness for Eastman's beneficiaries**

Eastman's beneficiaries attached as an exhibit to their response to PCEPA's motion for summary judgment the affidavit of Roy A. Martin, an electrical engineer. This Court finds the following paragraphs germane to this issue:

> 7. PCEPA's engineer-manager had actual knowledge of the tank work by reading two bid advertisements, the bid letting notice (3 -- 4 weeks prior to date of incident) in the local newspaper, and by conferring with the Prentiss County Board of Supervisors (PCBS) about the tank work, 1 to 1 ½ hours prior to the electrocution . . . .

. . . .

> 10. Electrical utilities, such as PCEPA, provide insulating blankets, covers, etc. and require use by electrically skilled employees (National Electrical Safety Code Rule 411.B.2). PCEPA did not place line hose (covers) on the wires. PCEPA did not de-energize the line. Both are Electric Utility practices to provide worker safety. Compliance with either practice would have prevented the Eastman electrocution.

> 11. National Electrical Safety Code Rule 420.B.1 requires electrical utility workers to heed warnings and warn others. PCEPA personnel were the only local, competent persons who could adequately warn the tank workers and, notwithstanding actual knowledge, immediately prior to the electrocution, failed to do so.

> . . . .

> 15. These acts of omission fell below the standard of care applicable to distributors of electricity.

> 16. The failure of PCEPA to meet the standards applicable to it proximately caused the electrocution of Robert Eastman.

On appeal Eastman's beneficiaries argue that Martin's affidavit "create[d] a jury issue on the questions of the standard of care applicable to PCEPA, the breach of that standard and the causation between the breach and the electrocution death of Robert Eastman." To counter their argument, PCEPA offers seven distinct criticisms of Martin's affidavit, the first of which is the following:

> First, Mr. Martin stated that "PCEPA had actual knowledge of the tank work." The actual

facts have shown that PCEPA did not have "actual knowledge of the tank work," since Mr. Creighton himself did not even consider making measurements "work." Furthermore, Mr. Creighton admitted that he did not intend to begin work on that day and Mr. Davis actually informed PCEPA that work would begin on a later date.

In their reply brief, Eastman's beneficiaries argue that under the Mississippi Rules of Civil Procedure, the affidavit need only be sworn, based on personal knowledge, and show that the party is competent to testify, citing *Palmer v. Biloxi Regional Medical Center*, 564 So. 2d 1346, 1356 (Miss. 1990). *See* M. R. C. P. 56(e). They argue further that even if Martin's affidavit is deficient for any reason, PCEPA waived any defect because it failed to file timely with the trial court a motion to strike the affidavit, in support of which argument they cite *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 365 (Miss. 1983).

We accept Eastman's beneficiaries' arguments and conclude that we may consider Martin's affidavit with regard to whether its contents created a genuine issue of material fact. However, we have already determined that foreman Creighton's testimony was insufficient to establish that he had notified PCEPA that his crew had begun dismantling the water tank on Friday morning, February 9, 1990; and we further noted that only Creighton's testimony addressed whether anyone had notified PCEPA that the dismantlement of the water tank had begun that very morning. We have further concluded that the circuit judge correctly found that the president of the Prentiss County Board of Supervisors had told the general manager of PCEPA that dismantling the water tank would not begin until the next day, a Saturday, February 10, 1990, or Monday, February 12, 1990.

In *Gulf Insurance v. Provine*, 321 So. 2d 311, 314 (Miss. 1975), the Mississippi Supreme Court explained: "Generally, the question as to whether or not the opinion of an expert is based on, and supported by, sufficient facts or evidence to sustain it, is a question of law for the court." The supreme court opined further: "It is only necessary that the facts on which an expert relies for his opinion should afford a reasonably accurate basis for his conclusion." *Id.* We conclude that Martin's affidavit was based entirely on his understanding that PCEPA had "actual knowledge of the tank work." Thus, the basis of Martin's opinion that PCEPA's acts of omission fell below the standard of care applicable to distributors of electricity and that its failure to meet the standards applicable to it proximately caused the electrocution of Robert Eastman rested on a fact for which there was no evidence whatsoever. Thus, Martin's affidavit can create no genuine issue of material fact.

### 5. Summary of PCEPA's common law duty to Eastman

Eastman's beneficiaries do not claim -- and there is no evidence to show -- that PCEPA was negligent in the design, construction, or maintenance of the 7,200 volt high-voltage line into which the steel tape blew and conducted that powerful electrical current into Eastman's body to claim his life. While it was foreseeable in terms of the dismantlement of the water tank that such a tragedy could occur, PCEPA could not foresee when Hercules would begin its disassembly and removal of the water tank. Implicit within Eastman's beneficiaries' argument that Creighton's inquiry about the removal of the power line beneath the tank on Friday morning before Eastman was electrocuted is the recognition that PCEPA was entitled to actual notice that Hercules had indeed begun to dismantle and to remove the water tank. Creighton's inquiry about removing the power line which ran beneath

the tank to the courthouse was simply inadequate to notify PCEPA that Hercules had already begun this process. The only evidence that PCEPA had been notified that the removal of the water tank was about to begin was the testimony of its general manager that the president of the board of supervisors told him that the procedure would begin either the next day, Saturday, or the following Monday.

When we discussed the standard of evaluating error in the grant or denial of motions for summary judgment, we noted that an issue of fact may be present where there is more than one reasonable interpretation that may be given undisputed testimony. For this Court to find a genuine issue of fact as to the invocation of PCEPA's duty to Eastman, we would be compelled to find that a reasonable interpretation of Creighton's inquiry about removing the power line from beneath the tank, which he made of an unidentified employee at PCEPA's office that morning, constituted notice to PCEPA that Hercules had actually begun dismantling the water tank. This Court finds such an interpretation to be unreasonable. Instead, because PCEPA did not bear the burden of proof on the issue of what duty PCEPA owed Eastman, it needed only to inform the trial court of the absence of evidence to support the Eastman's beneficiaries burden of proof on that issue. Because notice to PCEPA was required to invoke its duty to Eastman, and because there was no evidence to establish that PCEPA had been notified that Hercules would begin to dismantle the water tank on Friday, February 9, 1990, the circuit judge correctly concluded as matter of law that PCEPA owed no greater duty to Eastman than it did to the general public and that PCEPA was not guilty of any negligence proximately causing this accident.

## C. Sections 45-15-1 *et seq.* of the Mississippi Code of 1972

In its answer PCEPA raised as its sixth defense that "Robert L. Eastman, at the time of his death was acting in violation of Section 45-15-1 *et seq*. of the Mississippi Code and thus, failed to exercise ordinary and reasonable care for his own safety on the occasion in question." In its motion for summary judgment, PCEPA assigned as one reason to grant its motion the following argument:

> 1. PCEPA owed no duty, absent notice pursuant to Section 45-15-9 of the Mississippi Code, to deenergize or insulate its lines which were well within the requirements on the National Electrical Safety Code; . . . .

In its order granting PCEPA's motion for summary judgment, the circuit judge found as a matter of fact that Section 45-15-3(b) required that no person shall perform any work or permit any equipment or tools to come within ten feet of any high-voltage power lines; and in another finding of fact the circuit judge quoted the following portion of Section 45-15-9(1):

> If any person desires to carry on any function, activity, work or operation in closer proximity to any high voltage overhead line than permitted by this chapter, the person responsible for performing the work shall promptly notify the electric utility operating the high voltage overhead line, in writing, on a form to be provided by such electric utility, and shall not perform the work until mutually satisfactory arrangements have been made between such electric utility and the person or business entity responsible for performing the work, to deter contact with the high voltage overhead lines . . . .

Miss. Code Ann. § 45-15-9(1) (Rev. 1993). However, the circuit judge based none of his conclusions of law on Section 45-15-9.

In their brief, Eastman's beneficiaries argue that PCEPA proposes to use Section 45-15-9 to shield it from liability for Eastman's death because Hercules failed to notify PCEPA that it would begin the disassembly of the water tank. They further argue that the intent of Sections 45-15-1 *et seq.* is to protect the employee of a contractor who is injured by his contact with a high-voltage line. Thus, they argue that Sections 45-15-1 *et seq.* ought not to be used to ascribe negligence to the injured employee. *See Anderson v. Hensley-Schmidt, Inc*., 530 So. 2d 181, 184 (Miss. 1988) (Foreman's gross negligence in directing employees to place pole into the ground near power line is not attributable to employees who were killed by electrocution and thus they were not charged with contributory negligence.).

However, we understand PCEPA to argue that without Hercules' notifying it that Hercules had begun any activity at the water tank on Friday morning, February 9, 1990, PCEPA could not foresee the start of the disassembly and removal of the tower. Thus, Eastman could invoke no greater duty to him from PCEPA than PCEPA owed any member of the general public. PCEPA had discharged adequately its duty to members of the general public by designing, building, and maintaining the high voltage line into which the steel tape blew in accordance with the standards of the National Electrical Safety Code.

The Mississippi legislature enacted Sections 45-15-1, *et seq.* as Chapter 15 of Title 45, entitled "High Voltage Power Lines," in its session of 1988, and they became effective on July 1 of that year. A less detailed series of statutes had served as predecessors to the 1988 enactment since the legislature had enacted them in 1960. The predecessor statutes were originally codified as Sections 7015-11 *et seq.* of the Mississippi Code of 1942. The Mississippi Supreme Court has considered the predecessor sections in at least two cases. In *White v. Mississippi Power & Light Co*., 196 So. 2d 343, 350 (Miss. 1967), the Mississippi Supreme Court held that violation of the predecessor to Sections 45-15-1, *et seq.* by another party did not insulate the electric utility against its own negligence in failing to exercise due care in properly constructing its lines and maintaining and inspecting them so as to keep them in safe condition.

In *Monroe County Electric Power Ass'n v. Pace*, 461 So. 2d 739, 749 (Miss. 1984), the Mississippi Supreme Court held that the predecessor to the current Sections 45-15-1, *et seq*., prohibited the erection of a building within eight feet of a high voltage line. It appears that Eastman's beneficiaries are correct when they assert that the Mississippi Supreme Court has not considered the current Sections 45-15-1, *et seq*. of the Mississippi Code of 1972.

From our review of these sections, we note that Section 45-15-13(3) provides:

> Nothing contained in this chapter shall be construed to alter, amend, restrict or limit the liability of persons as defined herein for violation of his duty under current law to use a high degree of care in the construction, maintenance and supply of electricity; nor shall any person be relieved from liability as a result of violations of standards under existing law regarding the construction, maintenance and supply of electricity, where such failure

to use a high degree of care or violations of existing standards are found to be a cause of damage to property, personal injury or death.

Miss. Code Ann.§ 45-15-13(3) (Rev. 1993). We interpret this portion of Section 45-15-13 to mean that the duty which PCEPA owed Eastman remained unchanged unless something happened which resulted in the application of Sections 45-15-1, *et seq*. of the Mississippi Code of 1972 to the facts and/or issues in the case *sub judice*. Even the application of these sections might not modify PCEPA's duty to Eastman.

The portion of Section 45-15-9(1) which the circuit court quoted among its findings of fact required Hercules to promptly notify PCEPA, in writing, on a form to be provided by PCEPA if it "desire[d] to carry on any function, activity, work or operation in closer proximity to the high voltage overhead line [from which the electrical current discharged through the steel tape into Eastman's body] than permitted by this chapter." The record in the case contains no evidence that Hercules provided such written notification to PCEPA that it would begin its dismantling and removal of the water tank at any time.

Section 45-15-3 provides:

> Unless the procedures have been followed as provided by Sections 45-15-9 and 45-15-11, Mississippi Code of 1972, to deter contact with high voltage overhead lines:
>
> (a) No person shall, individually or through an agent or employee, perform or require any other person to perform any function or activity upon any land, building, highway or other premises if at any time during the performance of that function or activity the person performing the function or activity could be reasonably expected to move or be placed within ten (10) feet of any high voltage overhead line or if any equipment or part of any tool or material used by the person could be reasonably expected to move or be placed within ten (10) feet of any high voltage overhead line during the performance of any function or activity.

Miss. Code Ann. § 45-15-3(a) (Rev. 1993). However, the record contains evidence that the high voltage line into which the steel tape blew was 13.3 feet on a horizontal plane from the northernmost and nearest leg of the water tank. Eastman's beneficiaries do not dispute this distance. Therefore, Chapter 15 of Title 45 of the Mississippi Code of 1972, Sections 45-15-1, *et seq*., have absolutely no application to the facts in this case.

We find that Sections 45-15-1, *et seq*. of the Mississippi Code of 1972 are inapplicable and therefore wholly irrelevant to the issue in this case for three reasons. First, Section 45-15-13 retains the common law standard of care imposed on a commercial purveyor of electrical energy. Second, Hercules gave no written notice to PCEPA that it intended to begin dismantling and removing the water tank on Friday morning before Eastman was electrocuted. Third, the uncontroverted distance of the high voltage line in question was 13.3 feet from the northernmost leg of the water tank. Thus,

Chapter 15 of Title 45 is irrelevant and immaterial to PCEPA's duty to Eastman. The common law establishes PCEPA's duty -- not Chapter 15 of Title 45.

## IV. Summary

While the Mississippi Supreme Court has imposed an especially high standard of care on electric utilities such as PCEPA, it has also established that an electric company is not an insurer and is not liable for injuries unless it is guilty of some wrongful act or omission. Foreseeability is the magic word in determining whether the courts should impose a duty on any defendant. While we agree with Eastman's beneficiaries that an event such as the one which claimed their father's life was foreseeable in terms of dismantling the water tank, we cannot agree that PCEPA's general manager's knowledge that the Prentiss County Board of Supervisors intended to remove the old water tower and had taken preliminary steps to achieve that goal serves as a predicate for PCEPA's foreseeing that the destruction of the water tank was to begin on the Friday morning that Eastman was electrocuted.

We agree with PCEPA that it was entitled to notice that Hercules had begun to dismantle the water tank before it incurred any duty to Eastman. By its prudent design, construction, and maintenance of the 7,200 volt power line it had discharged its duty to members of the public in general. Our earlier analysis and critique of Creighton's testimony demonstrates that his inquiry about PCEPA's help in removing the power line which ran beneath the tank to the courthouse and his negative response to the question of whether he mentioned the high voltage lines to PCEPA's employee did not constitute notice to PCEPA that Hercules had begun the disassembly and removal of the water tank that fateful morning. The only evidence in the record of actual notice to PCEPA was the testimony of its general manager that the president of the board of supervisors told him that morning that Hercules would not begin work on the water tank until either Saturday, which was the next day, or the following Monday.

Chapter 15 of Title 45 of the Mississippi Code of 1972 entitled "High Voltage Power Lines" is irrelevant to the issue of whether the circuit court erred by granting PCEPA's motion for summary judgment for the three reasons which we have related. Other issues mentioned by Eastman's beneficiaries and PCEPA, *i. e.*, the negligence of Hercules and its foreman Creighton and Eastman's contributory negligence are rendered moot by our determination as a matter of law that PCEPA owed no greater duty to Eastman than it did to any other member of the public in the absence of notification to PCEPA that Hercules had begun to dismantle the water tank. We conclude that there was no genuine issue as to any material fact about whether there was notification to PCEPA that Hercules' crew had begun to dismantle the water tank before Eastman was electrocuted. We therefore determine that PCEPA was entitled to judgment as a matter of law about whether PCEPA owed a duty to Eastman. We affirm the circuit court's grant of summary judgment to the Prentiss County Electric Power Association.

**THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED. THE APPELLANTS ARE TAXED WITH ALL COSTS OF THIS APPEAL.**

**BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., DIAZ, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR. HERRING AND HINKEBEIN, JJ., NOT PARTICIPATING.**